[Civ. No. 10757. First Appellate District, Division Two.—April 18, 1938.]

In the Matter of the Estate of MICHAEL D. NOLAN, Deceased. DENIS NOLAN et al., Contestants, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, as Executor et al., Respondents; JAMES J. NOLAN, Appellant.

Duke & Cowen and C. F. Reindollar for Appellant.

John B. Ehlen and I. F. Chapman for Respondents.

NOURSE, P. J.—In this proceeding to revoke the probate of a will the contestants had a verdict. Two petitions on behalf of separate contestants were consolidated for trial. The petitions pleaded three grounds of contest—mental unsoundness, improper execution of the will and undue influence. At the conclusion of the contestants' case the contestees moved for a nonsuit, whereupon the contestants voluntarily dismissed as to their second and third grounds of contest. The motion for a nonsuit as to the remaining ground was denied. At the conclusion of the trial, the court denied contestees' motion for a directed verdict. The jury then returned a verdict that the testator was mentally unsound at the time of the execution of the will, whereupon the contestees moved for judgment notwithstanding the verdict. This motion was denied and judgment on the verdict was entered. The contestees have appealed from this judgment.

We will limit our opinion to the question of the sufficiency of the evidence to sustain the verdict, and will review the evidence in the light of these settled legal principles: ■ Every person of sound mind, over the age of eighteen years may dispose of his separate property by will (Probate Code, sec. 20); the property of the testator is his to dispose of as he wills, and he is not called upon to consult or satisfy the wishes or views of juries or courts (*Estate of Spencer*, 96 Cal. 448, 452 [31 Pac. 453]; *Estate of Perkins*, 195 Cal. 699, 709 [235 Pac. 45]); and ''Whether in the minds of others a will is just or unjust is a matter of opinion, and to permit a jury to determine the question without that substantial evidence which the law requires would be to permit a jury to make the disposition irrespective of the desires of a testator.'' (*Estate of Donovan*, 114 Cal. App. 228, 233 [299 Pac. 816].) ■ The single question of fact for the jury to determine in contests of this kind is whether, when the will was executed, the testator was of ''sound mind'' and thus within the terms of section 20 of the Probate Code. Numerous decisions have laid down the rule to be followed for that purpose. A clear and succinct statement of the rule is found in *Estate of Smith*, 200 Cal. 152, 158 [252 Pac. 325], as follows: ''A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument.''

We will first dispose of the question of the claimed unnaturalness of the will. The deceased was a bachelor, and left no parent, brother or sister. He lived alone in the city of Sausalito where he owned and operated a grocery store for many years. His next of kin were the nephews and nieces who are the contestants. The beneficiary was a cousin. Some of the contestants lived in Ireland, some in New York, and some in Canada. The testator had corresponded with some of those residing in Ireland until about two years prior to the execution of the will, but it does not appear that he had any knowledge of those living in New York or of those living in Canada. The beneficiary lived in Oakland, Cali-

fornia, and had visited the testator frequently, showed him many kindnesses, and had apparently won his admiration and regard. The testator had frequently urged the beneficiary to move to Sausalito and join him in the operation of the store. On numerous occasions the testator had been importuned to send money to some of his kin residing in Ireland, and some small sums had been sent, prior to the year 1932, to the mother of some of these contestants, a sister of the testator who predeceased him. About that time correspondence with these relations seems to have been discontinued. The will was executed in August, 1934; the testator died on April 14, 1936. No correspondence between any of these parties was produced in evidence covering the period after the year 1932. There is no evidence that the testator contributed any funds to aid any of the contestants after that year. There is some testimony that letters were received from the testator at a later period, but it is significant that none written after 1932 were preserved or offered in evidence.

Upon these facts the trial court instructed the jury that the beneficiary was not an heir at law of the testator and that, "In the absence of evidence explaining the testamentary disposition of a decedent's estate, *his will is to be considered unnatural* if, to the exclusion of natural objects of his bounty, it leaves his property to persons who would receive nothing in case he had died intestate." The error of this instruction is apparent. It arises from the loose language used in many of the decisions on the effect of "unnatural" provisions of a will. ■ This is an element supporting an *inference* of undue influence when the testament is attacked on that ground, and is of like value when it is claimed that the testator was laboring under hallucinations which had caused him to make an unreasonable or unjust discrimination against some of his heirs at law. But, when mental incapacity is the ground of attack, the dispository clauses of the will are not, in and of themselves, *evidence* of mental incapacity which would overcome the presumption of sanity and competence. Section 20 of the Probate Code provides that every person "of sound mind" may dispose of his property by will as he sees fit—not in equal proportions to those who would inherit under the laws of succession in case of intestacy. The law presumes that the testator was of sound

mind when the will was executed. Hence, the burden is upon the contestants to overcome this presumption with satisfactory proof. (*Estate of Smith,* 200 Cal. 152, 160 [252 Pac. 325].) The ''explanation'', so often referred to in the decisions, of the omission or failure to provide for the ''natural objects'' of his bounty may be required of the proponents when the undue influence in behalf of the named beneficiary has been shown, but no such burden rests upon them to support by further proof the legal presumption of sound mind. ■ For these reasons it was error to instruct the jury that the ''will is to be considered unnatural'' in the absence of such explanatory evidence. Having theretofore instructed the jury that an unjust or unnatural will was ''evidence'' of the mental incapacity of the testator, the court invaded the province of the jury when it declared that this will was to be considered an unnatural one.

As we shall hereafter point out, there was no substantial evidence of the mental incapacity of the testator and the jury's verdict can be explained only as an expression of its dissatisfaction with the disposition of the estate made in the will, and of its sympathy for those who were not provided for. The issue was given unusual stress by the contestants and a large part of the testimony was directed to the effort of showing that the will was unjust and unnatural. But the question was never properly an issue in this proceeding. ■ The expression ''natural objects'' of the testator's bounty has reference to the descendants, surviving spouse, and parents of the testator, who, purely by reason of relationship, may be assumed to have had claims upon his bounty. (26 Cal. Jur., p. 695.) Nephews, nieces, brothers, sisters, and other collateral heirs, are not, because of such relationship alone, natural or normal objects of bounty. (*Estate of Easton,* 140 Cal. App. 367, 377 [35 Pac. (2d) 614] ; *Estate of Jacobs,* 24 Cal. App. (2d) 649 [76 Pac. (2d) 128].) In *Estate of Finkler,* 3 Cal. (2d) 584, 597 [46 Pac. (2d) 149], it was held that nephews and nieces of a predeceased spouse, though heirs at law, were not the natural objects of the bounty of the testator. The undisputed evidence here is that many of the contestants were unknown to the testator; that he had not seen any of them and knew them only as children of his deceased brothers and sisters; that he had never contributed to their support after the death of their parents;

and that he had refused the importunities of one of the witnesses to give financial aid to some of the contestants sometime during the year 1932. He was a lone man who had gone through a long struggle to build up a moderate business. He lived alone and worked alone, and did not deem himself obligated to anyone.

■ The additional evidence offered by the contestants to prove his mental incapacity may be briefly summarized: Several of the witnesses testified that he failed to remember them when they came to his store, and that he had difficulty in making change on purchases. But these witnesses generally agreed that such lapses were merely temporary, that at other times he appeared rational, and that they continued to deal with him as they would with a man in possession of all his mental faculties. A salesman for a wholesale house found the deceased forgetful when he tried to collect a bill, but active and alert when he tried to sell the deceased more goods. Customers emphasized his difficulty in making change, and all said that he gave them too much, but his business continued to prosper for a year and a half after the will was executed, when he was compelled to retire because of ill health. In May, 1932, he suffered head injuries in a burglary at his store, and for some time thereafter had fainting spells. Much of the testimony of these witnesses related to that period. His physician testified that he had many mental lapses, but that he was sane and rational at other times. His regular attorney, who did not prepare the will, testified that he did not believe that the testator knew that he had signed the will, but, within three days after its execution and on several occasions thereafter, he discussed the subject with the deceased who told him he had made a will and named the beneficiary. The same witness, in his capacity of attorney for the deceased, prepared legal documents which he had the deceased execute and represented him in court proceedings both before and after the date of the execution of the will. On all these occasions he would have sworn that the deceased was mentally competent. Immediately after the execution of the will he discussed with the deceased the advisability of altering some of the provisions of the will, or the making of a new will. He was prepared to perform that service and would have judged the deceased competent on those occasions to perform the

testamentary act. A physician, who first treated the deceased for the head injuries in 1932, testified that he called on the deceased on several occasions during the years 1932 to 1935, that he believed the deceased was incompetent at the time he executed the will. He gave no reason for his opinion except that the deceased suffered lapses of memory, fainting spells, and periods of extreme illness. He testified that he was competent on many of the occasions when he saw him. He gave the opinion that during the periods of mental incompetency it would have been impossible for the deceased to add a column of figures, write, sign his name, give information concerning his relatives and where they lived, or keep accounts with customers of goods charged to them—all of which acts the deceased performed at the time the will was made.

Merely for the purpose of completing the story of the trial we will add a short *résumé* of proponents' evidence. The two subscribing witnesses, who were employees of the local bank where the deceased had done his banking business over a period of seven years, testified that he was mentally competent when the will was executed. He gave to one of them all the information relating to his property and kin. He assigned as his reason for preferring the named beneficiary (James Nolan) that the latter had been kind to him, and that he hoped to have him join him in the conduct of his business. He gave the name and address of the nephew living in Ireland who was designated as a beneficiary in the event that James Nolan should predecease him. He stated to these witnesses that he had other nephews and nieces living in Ireland, but that he did not want them to have any of his property. It was also shown that he conducted the store without help; did all his buying for the store; kept books of account; owned and rented real property; loaned money on mortgages; executed in his own hand promissory notes and receipts for money paid; and conducted his banking business without outside aid. He employed a regular attorney, who prepared mortgages and similar documents for him to sign and represented him in legal proceedings.

The testimony of the witnesses upon which the contestants rely must be measured by the rule that their opinion that the testator was of unsound mind "is of no greater value than the reasons given in support of the opinion". (*Estate*

*of Flint,* 179 Cal. 552, 553 [177 Pac. 451] ; *Estate of Red-field,* 116 Cal. 637, 655 [48 Pac. 794] ; *Estate of Finkler,* 3 Cal. (2d) 584, 594 [46 Pac. (2d) 149].) In the latter case the court approved this statement taken from *Stackhouse* v. *Horton,* 15 N. J. Eq. 202: "No judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinion of witnesses however numerous or respectable. A man may be of unsound mind, and his whole neighborhood may declare him so. But whether that unsoundness amounts to incapacity for a discharge of the important duty of making a final disposal of his property, is a question which the court must determine upon its own responsibility." While some of the testimony offered by contestants tends to show that decedent displayed lapses of memory, and certain peculiarities over a period of four or five years, the same testimony showed that, during all the period covered, he was conducting his business in an efficient, methodical, and businesslike manner, and usually without the help or advice of anyone, other than his attorney. The case may be summed up in the language of *Estate of Wright,* 7 Cal. (2d) 348, 356 [60 Pac. (2d) 434], reading: "Tested by the decisions of this court the judgment is wholly without evidentiary support. There is no evidence that testator suffered from settled insanity, hallucinations or delusions. Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act. . . . The burden was upon contestant throughout the case. Taking all the evidence adduced by contestant as true, it falls far below the requirements of the law as constituting satisfactory rebuttal of the inference of testamentary capacity. No proof whatever was offered tending to rebut the testator's ability to transact or conduct his business or to care for himself except in a few cases of illness brought about by natural causes or excesses or by accident." · Recent cases to the same effect are: *Estate of Finkler,* 3 Cal. (2d) 584, 596 [46 Pac. (2d) 149], *Estate of Smith,* 200 Cal. 152, 158 [252 Pac. 325], *Estate of Peterkin,* 23 Cal. App. (2d) 597 [73 Pac. (2d) 897], and *Estate of Flatau,* 10 Cal. (2d) 701 [76 Pac. (2d) 506].

All the parties here had their day in court, and the litigation should be ended without unnecessary delay and expense. The motion of the proponents for a judgment notwithstanding the verdict should have been granted.

It appearing from the whole evidence that a verdict should have been directed in favor of proponents, and that a motion therefor was made before entry of judgment, the judgment is reversed with directions to enter judgment in their favor as prayed.

Sturtevant, J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 18, 1938, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 16, 1938.