[Civ. No. 15219. Second Dist., Div. Three. Aug. 1, 1946.]

Estate of JOHN HENRY MOREY, Deceased. MABEL MOREY et al., Appellants, v. RALPH E. JOHNSON, Respondent.

Macdonald & Pettit and L. H. Phillips for Appellants.

Newton Van Why for Respondent.

SHINN, J.—The will of John Henry Morey, who died October 26, 1944, was filled in by him on a printed form. It stated that he was 74 years of age, that the document was made, published and declared by him to be his last will and testament, and it contained the following provisions in handwriting: "(First: printed) I declare that I am married and that my wife's name is Mabel Morey. (Secondly: printed) I give devise and bequeath unto my wife Mabel Morey the sum of One hundred dollars, having already given her a certain amount of cash which was agreeable to her and for which I hold a receipt which receipt will be found among my personal effects. (Thirdly: written) I give devise and bequeath unto Mr. Ralph E. Johnson, and his wife Jennie Johnson (share and share alike) the property known as 1311 West 46th St. in the City of Los Angeles Calif. consisting of a Two story residence complete with all its contents. Also a garage complete with all its contents which includes a 1940 Buick auto (5 pass.). The above described property being my home at the time of my demise. Mr. Ralph E. Johnson's present address being 1241 West 47th St. Los Angeles Calif." The printed portion which followed was filled in with the name and address of Ralph E. Johnson, who was named as executor, and the date of the will, January 6th, 1942, was written in. The will concluded as follows:

"IN WITNESS WHEREOF, I have hereunto set my hand and seal this  6th  day of  January,  in the year of our Lord nineteen hundred and forty two.

[SEAL]

"THE FOREGOING instrument, consisting of  Three  pages  including this one was at the date hereof, by the said  John Henry Morey  signed, and sealed and published as, and declared to us to be his  last Will and Testament, in the presence of us, who, at his  request and in his  presence, and in the presence of each other, have subscribed our names as witnesses thereto,
    Ralph W. Poundstone
Residing at  1317 - W 46 St.
    William C. Richards
Residing at  1321 W 46th St. Los Angeles Calif."

The name "John Henry Morey" appearing in the attestation clause was that of the testator, written by himself, and this the court found to be his subscription to the will.

The will was contested for want of due execution and upon the ground of incompetency of the testator. Both issues were resolved in favor of the proponent and the contestants appeal.

The provisions of section 50 of the Probate Code which it is claimed were not observed are the following:

"(1) *Subscription.* It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto. A person who subscribes the testator's name, by his direction, should write his own name as a witness to the will, but a failure to do so will not affect the validity of the will.

"(2) *Presence of witnesses.* The subscription must be made, or the testator must acknowledge it to have been made by him or by his authority, in the presence of both of the attesting witnesses, present at the same time.

"(3) *Testator's declaration.* The testator, at the time of subscribing or acknowledging the instrument, must declare to the attesting witnesses that it is his will.

"(4) *Number of witnesses, attestation.* There must be at least two attesting witnesses, each of whom must sign the instrument as a witness, at the end of the will, at the testator's request and in his presence. The witnesses should give their places of residence, but a failure to do so will not affect the validity of the will."

It is contended by appellants that a testator who places his signature in a blank space in the attestation clause has not subscribed his name at the end of the will as the law requires. It is conceded, as it must be, that if the signature of Mr. Morey had been placed immediately above the attestation clause it would have been at the end of the will, but it is argued that because it was written in the blank space in that clause, it should be considered only as a completion of the form of that clause and not as the testator's subscription to the will.

The physical construction of the document differs in form from that of any will considered in the California cases, but the rule by which its sufficiency is to be tested is not in doubt. It was stated and applied in two cases, in one of which it was held that the signature of the testator had been affixed at

the end of the will, and in the other of which it was held that the signatures of the subscribing witnesses were not, as required by law, affixed at the end of the will. The first case is *Estate of Seaman,* 146 Cal. 455 [80 P. 700, 106 Am.St.Rep. 53, 2 Ann.Cas. 726]; the second, *Estate of Moro,* 183 Cal. 29 [190 P. 168, 10 A.L.R. 422]. Our reasons for choosing these two cases will appear in our discussion of them. In *Estate of Seaman* a printed form of will, consisting of four pages, was used. They were intended to be folded twice from the bottom. There would thus be exposed on the outside, as folded, the lower half of the reverse side of page four, one-quarter of the page on one side of the folded instrument and one-quarter upon the other side. Upon this exposed portion of page four there had been printed the words, "The Last Will and Testament of ————." Beneath these words the scrivener had written the name of the testator, and underneath this the testator had subscribed his name, and following his signature and under the word "Witnesses" the subscribing witnesses had affixed their signatures. The will was written upon page one and a part of page two. On page three there was a printed form for the appointment of an executor and the revocation of former wills and the attestation clause. These were not filled in or signed. The remainder of the third page and the upper half of the fourth page were left blank. The court held that the signature of the testator as subscribed upon the outside of the folded document was not placed at the end of the will. In *Estate of Moro* the will had been typed upon three separate sheets of paper stapled together. The body of the will covered the first sheet and a part of the second. Immediately following this were the words "In Witness Whereof," etc., and thereunder was a line drawn upon which the testator affixed his signature. The remainder of the second page, some eight and one-half inches in length, was blank. The attestation clause was typed at the top of the third page and the signatures of the attesting witnesses were affixed thereunder. The contention was that the signatures of the witnesses, being upon a separate sheet of paper and with some eight and one-half inches of blank space upon the second sheet, were not affixed at the end of the will. Certain of the statements of the court in *Estate of Seaman* were relied upon as supporting this contention. The court held that the signatures of the witnesses were affixed at the end of the will. Chief Justice Beatty, in his concurring opinion in *Estate of*

*Seaman,* said (p. 467) : "The true test to determine whether a decedent has subscribed his name at the end of a will is to take the document as it left his hand, and then, disregarding the signatures of the witnesses, and all evidence *aliunde,* to see whether it is apparent that his name was placed where it appears for the purpose of execution." Justices Angellotti and Shaw concurred in this statement and added that "the name must, of course, be subscribed after the termination of the testamentary provisions." The reasons stated in the several opinions in support of the rule announced are conclusive.

The question which the trial court in the instant case answered in the affirmative was whether the signature of Mr. Morey was placed where it appears in the will "for the purpose of execution." Appellants say that it is more reasonable to believe that it was placed there in order to trick the subscribing witnesses into affixing their signatures, and with the intention upon the part of Morey to sign it or not, as he might decide after further reflection. The argument is not convincing. It would have been a pointless thing to do. One who goes about making a will is in a serious frame of mind and not up to tricks. The signature was but a scant inch and a half below the signature line in the printed form, with one line of printing intervening. Two friends had been called in to witness the will, the acts of Mr. Morey unequivocally indicated that he purposed to execute the will at that time and in their presence, and it seems to be altogether clear that he affixed his signature for the purpose of executing the document as his will. The fact that the signature was not placed where it was supposed to be means nothing if its position indicates that Mr. Morey believed that it belonged where he put it. The court did not err in holding that the signature was at the end of the will and was placed there for the purpose of execution.

The second contention of appellants is twofold, namely, that there was insufficient evidence to prove (a) that the subscription was made by the testator or acknowledged to have been made by him in the presence of both attesting witnesses present at the same time, or (b) that the testator declared to the attesting witnesses that it was his will.

The evidence disclosed the following facts: Mr. Morey requested his friends, Messrs. Poundstone and Richards, to come to his house, stating to Mr. Poundstone that he wanted him to witness his will with Mr. Richards, and stating to Mr.

Richards that he wanted him to sign a document—that he wanted him to witness a document. He did not tell Mr. Richards that it was a will he was to witness, but Mr. Richards understood it was a will. When shown the will, the witness Poundstone testified, "Well, that is ⸚'s signature, I know that." Mr. Poundstone, when asked what Mr. Morey said, replied: "He said it was his will and he wanted us to sign his will—— I signed the two wills for him and I am not sure this is the one where he stated he was signing his will or not. One will that he witnessed, he said that that was his signature." His attention was called to Mr. Morey's signature on the will and he was asked, "He either signed that in your presence and Mr. Richards' presence or declared to you that it was his signature in Mr. Richards' presence? A. Yes. Q. It was some years before when you signed another will for him? A. Yes. Q. In one of those you saw him sign his name in the presence of Mr. Richards and yourself? A. Yes. Q. And in the other he declared to you that it was his signature and he asked you to sign? A. Yes." Mr. Richards testified that he signed the will as a witness and because Morey asked him to sign it, and "Q. At that time was his name written there in the attestation clause, 'John Henry Morey.' A. It was. Q. What did he say when he asked you to sign it? A. Well, he said that he wanted us to witness that that was his name there. Q. That that was his name? Did he say whether or not it was a will? A. I don't remember whether he designated it as a will or not. Q. Did he tell you that he wanted you to sign as a witness and that that was his signature? A. No, that that was his name. He did not say signature as far as I know. Q. Did he point that out to you and say 'That is my name?' A. Yes. Q. Then he wanted you to sign? A. Yes."

According to Mr. Richards' testimony, Mr. Morey, in the presence of the two witnesses, pointed to his signature and said that it was his name. According to the testimony of Poundstone, Mr. Morey said it was his will and he wanted them to sign it; that he either signed it in their presence or declared "that it was his signature." This evidence was sufficient to support findings that the subscription to the will was acknowledged to the witnesses by Mr. Morey and that he declared it to be his will. The court found that the testator "acknowledged" the will in the presence of said witnesses present at the same time and that the witnesses signed at the

634

request of the testator and in his presence and in the presence of each other. There were further findings, "That it is not true the deceased did not subscribe said will at the end thereof, or acknowledged his subscription to have been made by him at the end thereof in the presence of Ralph W. Poundstone and William C. Richards" and, "That it is not true that said John Henry Morey did not declare said instrument to be his last will and testament in the presence of said witnesses or either of them." Although the witnesses differed in their recollection as to what took place and was said, it was the province of the trial judge to compare and weigh their testimony and to accept or reject it in whole or in part. In addition to their testimony, the circumstantial evidence was of considerable weight. ■■ The presentation of the will to the witnesses, bearing the signature of Mr. Morey, even without spoken words, indicated to them that it was his signature; and such presentation with a request that they sign it, without more, would have been an unspoken declaration that it was his will. (*Estate of Abbey,* 183 Cal. 524 [191 P. 893].) ■■ Proof of the signatures of Mr. Morey and of the subscribing witnesses placed in operation a presumption that the will had been duly executed. (*Estate of Pitcairn,* 6 Cal.2d 730, 732 [59 P.2d 90]; *Estate of Braue,* 45 Cal.App.2d 502, 505 [114 P.2d 386]; *Estate of Silva,* 169 Cal. 116, 120 [145 P. 1015].) This presumption was to be weighed with the testimony of the subscribing witnesses as to what took place or did not take place and as to what they remembered or did not remember. The findings that the will was duly executed are not unsupported by the evidence.

■■ It is earnestly insisted that the evidence of the contestants of Mr. Morey's incompetency was so strong and that of the proponent so weak that the finding that he was competent is without any substantial support in the evidence. There was no evidence as to whether the handwriting in the will was that of Mr. Morey, nor any evidence that he had received assistance in the preparation of the will. The signature was in a firm, strong hand and the same was true of all the handwriting.

Numerous witnesses, friends of Mr. Morey, stated it to be their opinions that he was incompetent. His widow testified that he attempted suicide three times, "had constantly gone into spells; he would go upstairs" and that she would hear him crying. A cousin by marriage testified that decedent was

very excitable, "he was sort of fidgety," and that he would laugh in a way that she would call simple or silly, and she detailed numerous eccentricities and evidences of childishness and excited conduct. Another witness testified that Mr. Morey in 1942 "was talking a little in circles and had forgotten that he had met the wife of the witness when she was a little girl in Saratoga Springs, and that he had known her also in New York and San Diego"; that Mr. Morey "was living in the past definitely with his first wife, Hattie." Another witness testified that she had frequently seen Morey sobbing convulsively like a child; that he also pretended to be talking on the telephone when she knew it was mere pretense. Another witness testified that she had seen him cutting the lawn wearing only underwear and high shoes and an old hat so she could hardly see his face. Other testimony was to the same general effect and need not be stated.

The subscribing witnesses declined to give any opinion as to his competency. The proponent Johnson testified, but his testimony could not be transcribed by reason of the serious illness of the reporter who took it. By stipulation it was given in narrative form. He testified that he had been a friend and neighbor for many years. He identified the signature in the attestation clause as that of Mr. Morey and testified that in his opinion Mr. Morey was competent to make a will on January 5 (6), 1942. He testified that he had heard the testimony of the witnesses for the contestants and that in his opinion the actions of Mr. Morey as detailed by these witnesses did not indicate to him that Mr. Morey was incompetent. A hospital record was received in evidence, which disclosed that he entered the hospital April 23, 1942, and that a diagnosis was made, "Slight mercury poison, senility," and recited that while he was in the hospital he attempted suicide by taking a tablet of bichloride of mercury. It stated that the patient said "that for 15 years he had been off mentally." The physical findings were, "Old man of 75 years who lies in bed, not ill but talks about many things, seems to get lost in his subject. General condition moderately good. Mentally disturbed. C. M. McMullen, M. D." Doctor McMullen was not called as a witness.

Mr. Morey had been married to his second wife for about six years. He was passionately devoted to the memory of his first wife. He had several phonograph records which he played occasionally and which evidently brought back vivid

recollections of his past life. It appears to have been the memory of his first wife which occasioned his crying spells. On seven different occasions he persuaded his second wife to leave him for visits with friends and relatives in order that he might be alone. He had a feeling that his first wife was in the home and expressed a desire to be alone. This desire soon left him and he appeared greatly pleased to have his wife return. The evidence did not by any means show conclusively that Mr. Morey was lacking in testamentary capacity. While a number of witnesses expressed the opinion that he was incompetent, the facts upon which such opinions were based did not indicate that he was unable to remember and keep in mind the nature, character and value of his property or to form intelligent opinions as to his relations toward those about him or the claims of his relatives and friends upon his bounty. There was no evidence that at the time of the execution of the will Mr. Morey was mentally disturbed or excited; upon the contrary, it would appear that he was in a quiet and natural state of mind. Mrs. Morey testified that at one time decedent had given her $9,000 in cash, which was placed in a joint safe deposit box, but that he thereafter took out $5,000; that at different times he placed large sums of money on a table and invited her to take it, which she declined to do. He made gifts to nieces and other relatives, ranging from $500 to $1,000 each, and made smaller gifts to friends. There was no evidence that he was bitter or unfriendly or possessed of hallucinations or delusions. Mrs. Morey testified that he was very orderly and took care of himself well. Mr. Johnson, the principal beneficiary of the will, had been a neighbor and close friend for many years. There was no evidence that Mr. Morey had received assistance in the preparation of the will.

In April, 1942, about three months after the will was signed, Mr. Morey attempted suicide, the incident was reported to the police by Mr. Johnson, and Mr. Morey was taken to the receiving hospital. On that date he wrote the following note to Mr. Johnson: "Dear Ralph, enclosed you will find four keys, each one properly tagged. Unlock door to closet in library. On top of the safe you will find instructions and a memorandum sufficient to cover every—— I guess that is 'contingency,' I believe. Goodbye to you all. J. H. Morey." Below was written: "Tell Mrs. Seman—— contingency—— no collection. P. S. Call an officer to enter the

house with you. J. H. Morey.'' The police found another note on the piano in Mr. Morey's home, which read as follows: ''With memory failing fast, cataracts forming in both eyes, and intense desire to penetrate the mystery beyond, and believing that some good may be accomplished by my quitting this medium sphere, why hesitate? This in no way reflects upon my wife Mabel who is at present visiting a relative in Phoenix whose address is 38 West Windsor Avenue, care of Mrs. A. K. Smith. She alone has made life worth living up to the present time. My will is properly executed, and Mr. Ralph Johnson is named executor and will look after all details. Said details are embodied in a letter addressed to Mr. Johnson who resides at 1241 West 47th Street. Here is hoping to join my comrades of nearly fifty years, assuming such a thing to be possible. John H. Morey, 1311 West 46th Street. Mr. Ralph Johnson's address is 1241 West 47th Street, and Mr. Ralph Johnson's phone, Axminster 19069.'' At the same time a letter was found upon Mr. Morey's desk, sealed and airmail stamped, addressed to Mrs. Morey, who was then visiting in Phoenix. This letter was not produced. Those that were received in evidence indicated that the writer was possessed of an active and reasoning mentality.

It is not necessary to refer to the multitude of decisions holding that peculiarities, eccentricities and occasional departure from normal conduct do not show a want of testamentary capacity where the testator is able to and does have a clear understanding of his estate and the ability to form a rational opinion as to what would be a fair, just and reasonable division of it among his friends and relatives or others in whom he feels an especial interest. (See *Estate of Schwartz*, 67 Cal.App.2d 512, 519-20 [155 P.2d 76], and cases cited therein.)

The judgment is affirmed. The attempted appeal from the order denying motion for new trial is dismissed.

Desmond, P. J., and Wood, J., concurred.

A petition for a rehearing was denied August 16, 1946, and appellants' petition for a hearing by the Supreme Court was denied September 19, 1946.