[Civ. No. 17208. First Dist., Div. One. May 28, 1957.]

Estate of JOSEPHINE DARILEK, Deceased. LEO HONSA, Appellant, v. ANNIE HOSPODARSKY et al., Respondents.

Jesse A. Mueller and Courtney L. Moore for Appellant.

Harold J. Scott and Alvin A. Lobree for Respondents.

BRAY, J.—Respondent Annie Hospodarsky, named therein as executrix, offered for probate a will of decedent dated December 2, 1953. Appellant, Leo Honsa, filed a contest thereof on three grounds: (1) lack of due execution; (2) lack of testamentary capacity; (3) undue influence of respondent. Appellant appeals from a judgment of nonsuit, presenting as the sole question the sufficiency of the evidence as a matter of law.

EVIDENCE

Decedent at the time of the execution of the will was approximately 84 years of age. She died 14 days after its execution. Appellant is a nephew of decedent, being the son of her predeceased sister. Respondent is a friend of decedent, the widow of Frank Hospodarsky, a predeceased cousin of decedent.

1. *Execution of Will.*

Alice Bickel, a registered nurse at St. Joseph's Hospital where decedent was confined, went to the latter's room at the request of a student nurse. There she found, besides decedent, Dr. Haage and Attorney Scott. Scott informed her she was to be a witness to the will. Scott read the will aloud and asked decedent if she wanted any changes. She said "no." He asked her if she wanted Mrs. Bickel and Dr. Haage to act as witnesses. She said "yes." Decedent was propped up in bed. Mrs. Bickel held a book in front of her upon which decedent signed both pages of the will. Although weak, no one guided her hand. The first pen did not work well and decedent had trouble writing up hill. She started to sign with Scott's pen, finishing with Mrs. Bickel's. Decedent acknowledged the document to be her will in the presence of Dr. Haage and Mrs. Bickel. Both witnesses signed it in decedent's presence and in the presence of each other.

Dr. Haage, decedent's attending physician, the other witness to the will, was called in to the room by Attorney Scott. Present were decedent, Mrs. Bickel and Scott. Dr. Haage could not remember whether she or Mrs. Bickel came into the room first. Respondent and a man were in the room but Dr. Haage could not remember whether they came in before or after Dr. Haage witnessed the will. She first stated that respondent and her son were in the room; then she testified that she was not sure about it; that she could not remember. Scott read the will. Dr. Haage signed the will in the presence of decedent but does not remember seeing Mrs. Bickel sign it. On cross-examination she testified she could not remember telling appellant that only Scott and respondent were in the room or that she did not know of any nurse witnessing the will, nor of telling appellant's attorney that there was no nurse present when she witnessed the will. Appellant testified that Dr. Haage had told him that decedent, Scott, a stout lady and a young man were present at the execution of the will, and that no nurse was present. Other than the evidence concerning statements claimed to have been made by Dr. Haage for

impeachment purposes appellant offered no evidence concerning the execution of the will. Such impeachment evidence does not present a conflict in the evidence as to what occurred at the execution of the will. (*Estate of Kent* (1911), 161 Cal. 142, 148 [118 P. 523] ; *Moffatt* v. *Lewis* (1932), 123 Cal.App. 307, 310 [11 P.2d 397] ; 19 Cal.Jur.2d 115.) The evidence, without conflict, made out a prima facie case of due execution. Once the proponent of a will proves a prima facie case of due execution the burden is on the contestant to show lack of due execution by positive and affirmative evidence. (*Swift* v. *Superior Court*, 39 Cal.2d 358 [247 P.2d 6] ; *Estate of Morey*, 75 Cal.App.2d 628 [171 P.2d 131].) The forgetfulness of one of the attesting witnesses does not destroy the other proof. (*Estate of Harvey*, 143 Cal.App.2d 368, 372 [299 P.2d 712].) At argument appellant conceded that the probate court correctly granted a nonsuit on this issue and stated that he was not appealing therefrom.

2. *Testamentary Capacity.*

In the latter part of November, Mrs. Nelson, a friend of decedent's, phoned respondent, who had known decedent for a long period, of her illness. Respondent went to decedent's basement flat. Decedent was cold. Therefore respondent and her son Frank took decedent to respondent's home where she stayed for 10 days. No doctor was called. Around Thanksgiving decedent wanted to go home. Respondent and Frank took her to her cold apartment and left her there alone. Respondent knew appellant and that he was the nephew and she also knew his phone number. Respondent did not call him about his aunt's illness. A couple of days later, November 29th, Mrs. Nelson again phoned respondent concerning decedent. At decedent's apartment a doctor informed respondent that decedent must go to the hospital. Respondent accompanied her to the hospital in the ambulance. The next day respondent phoned appellant's home and informed his wife that decedent was in the hospital. December 3rd appellant learned of this from his wife. He immediately left Healdsburg, where he lives, for San Francisco. He had last seen his aunt in October when her condition seemed fairly good and she seemed to be happy. At the hospital she appeared thin and sunken, her eyes glassy. She was inattentive to anything that was said. Her only response was ''Oh.'' She could not talk. She did not say a word that was plain enough to understand. After 10 to 15 minutes the nurse requested him to leave. After his aunt's death appellant asked Dr. Haage's

opinion as to decedent's mental condition and was told that the doctor believed her to have been of sound mind.

Marian Van Gieson, a registered nurse, saw decedent the night before she was taken to the hospital. Decedent was weak, with a bad pulse. Her lips were blue. She was a very sick woman.

Obviously there is no evidence in any of the above of lack of testamentary capacity at the time of the execution of the will. ■ It is the testimony of Dr. Kelley, a licensed physician, upon which appellant relies as evidence to meet the presumption of capacity and lack of evidence of incapacity. He did not see decedent but described her condition on December 1st (the day before the execution of the will) as it appeared from the hospital records. The record showed that she had congestive heart disease; her heart was not getting the blood around; she had auricular fibrillation, which meant that the heart instead of pumping the blood was merely fluttering. The basic diagnosis was bronchial pneumonia and hypertensive cardiovascular disease (high blood pressure). At 9 p.m. the nurse noted ''She talks to herself. Difficult to make patient understand instructions.''* Dr. Kelley then stated that he would feel that ''probably at this point she was quite confused, and since she then got worse, I would think this confusion continued until the oxygen was administered on the 3rd.'' Dr. Kelley qualified as a physician and psychiatrist and also as a handwriting expert. He was shown exemplars of decedent's handwriting written in November and her signatures on the will of December 2nd. Basing his opinion on the portion of the hospital records hereinbefore referred to and his examination of her signatures on the will he gave it as his opinion that decedent was not competent to know what she was doing at the time of the execution of the will. He further testified that she was unable to ''know who their heirs were or the persons entitled to their bounty, or anything connected with their affairs.'' The trial court held, and we think properly so, that upon this meager background Dr. Kelley's opinion was too speculative to constitute substantial evidence of testamentary incapacity. ■ Proof of extreme feebleness, sickness, old age, etc., does not prove mental incapacity nor shift the burden of proof on the proponent. (*Estate of Latour,* 140 Cal. 414 [73 P. 1070, 74 P. 441]; *Estate of Casarotti,* 184

---

*There was also an entry that on this day decedent was of ''clear'' mind. There is no entry of any kind on December 2d except one at 4 a. m. to the effect that decedent had a good night. Dr. Kelley testified that this was probably due to sedation.

Cal. 73 [192 P. 1085].) Substantial evidence is necessary to create the required conflict. (See Witkin, California Procedure, p. 1858, § 126.) See *Estate of Little* (1920), 46 Cal.App. 776 [189 P. 818], where judgment of nonsuit was affirmed, the court rejecting expert opinion that the testator was insane based on a comparison of the testator's writing as being insufficient evidence.

 A contestant is required to prove testamentary incapacity at the very moment of the execution of the will. There is a presumption that a person is of sound mind at that very time. (*Estate of Greenhill*, 99 Cal.App.2d 155, 166 [221 P.2d 310].) Also a contestant must prove that the will was not made at a lucid interval. (*Estate of Lingenfelter*, 38 Cal.2d 571 [241 P.2d 990]; *Estate of Barr*, 69 Cal.App. 16 [230 P. 181].)

The medical testimony here was similar to that in *Estate of Powers*, 81 Cal.App.2d 480 [184 P.2d 319], where the court held that as a matter of law the testimony was not substantial enough to support the jury's finding that the testatrix lacked testamentary capacity. There, as here, a comparison of the testatrix's handwriting on the will with other exemplars of her handwriting was made. There, two medical experts, while here only one, examined the hospital records and "accepted only those portions of the hospital records which supported their opinions and rejected those portions which contradicted their opinions." (P. 485.) By coincidence, the hospital record in that case, just as in our case, had no entry on the day the will was executed. Stronger than our case, the hospital records there showed that the day before the execution of the will the testatrix was not only confused but at times irrational. Concerning this situation the court said, and its statement is particularly applicable (except that no irrationality appears in our hospital records) (pp. 482-483): "We cannot agree with appellant that the entries on the hospital charts constitute substantial evidence that the testatrix did not possess testamentary capacity on June 18. The critical inquiry is directed to the condition of the testatrix' mind at the very time of the execution of the will [citations], and there is a presumption of testamentary capacity which requires substantial evidence to overcome [citations]. The most that can be said for the hospital records is that they show intermittent periods of mental confusion and irrationality and as we approach the critical date of June 18, we find that the record shows on June 17

'Confused, irrational at times,' which carries the clear implication that the testatrix was only intermittently confused and irrational on that date, and on June 18, there is a complete absence of any entry which would tend in the slightest to prove that the testatrix lacked testamentary capacity on that day." Concerning the opinion of the experts in relying only on the portion of the hospital records which they considered supported their opinions the court said (and again, we deem the language particularly applicable to our case) (pp. 485-486): "It is impossible for any expert basing his testimony solely upon other evidence introduced in the case thus to lift himself by his own bootstraps. If his opinion is not based upon facts otherwise proved, or assumes facts contrary to the only proof, it cannot rise to the dignity of substantial evidence. . . . If the evidence of the two doctors who purported to base their testimony on the records, but actually assumed the portions of the records to be inaccurate which contradicted their expressed opinions, was allowed to prevail we would have a situation in direct conflict with the statement quoted by the Supreme Court in *Alaska Packers Assn.* v. *Industrial Acc. Com., supra,* 1 Cal.2d 250, 263 [34 P.2d 716], that: ' "there was no true conflict in the evidence where that on one side consists of opinions based on facts not shown by the record to exist, while that on the other side was based upon facts actually shown to exist or rested on the testimony of physicians who had actually treated and examined the patient." ' "

The probate court was right in holding that there was no substantial evidence to support a jury's finding of mental incapacity had one been made. The facts in *Estate of Fosselman,* 48 Cal.2d 179 [308 P.2d 336]; are so dissimilar to those here as to make that case completely inapplicable.

3. *Undue Influence.*

As will appear from a recital of the evidence on this subject, there was no direct evidence of actual undue influence. At the most, except as to the testimony of Mrs. Crowley, there is shown opportunity and interest, which, of course, alone are not sufficient to set aside a will. (*Estate of Holloway,* 195 Cal. 711 [235 P. 1012].) Respondent testified to knowing decedent, her husband's cousin, for 29 years, during which decedent had never discussed her business affairs with respondent. When Mrs. Nelson phoned her in November that decedent was sick she went to decedent's flat and found

that she was cold. Respondent and her son took decedent to their home, where she stayed for 10 days, after which time decedent wanted to go home. Respondent and a Mr. Blahy took her home to her cold flat where she remained alone. Respondent did not phone appellant about decedent's condition. On November 29th Mrs. Nelson again phoned respondent about decedent. Respondent went to the flat. Dr. Haage had been called by someone other than respondent. Respondent did not remember whether the doctor was there or came in after respondent's arrival. Respondent accompanied decedent to the hospital. Respondent informed the hospital authorities of appellant's relationship. The next day she phoned appellant's wife. Decedent asked respondent to obtain a lawyer for her. Respondent suggested Attorney Mueller, who had represented decedent before, but decedent rejected him. Respondent then suggested Attorney Scott and decedent agreed. Respondent had a "nodding acquaintance" with Scott as they had adjacent summer homes on the Russian River. Respondent called her son asking him to call Scott. At the hospital respondent introduced Scott to decedent. Respondent did not inform him of decedent's relatives because she only knew appellant and of a nephew in Chicago. Respondent was not present when the will was discussed nor during its execution. She entered the hospital room just as the nurse and Scott were leaving. Respondent did not know that a will had been made until decedent so informed her two days later. She was not told its contents. She learned that she was executrix and a beneficiary only after decedent's death. She told appellant the day he visited his aunt in the hospital that decedent had made a will.

Appellant's mother had lived with decedent from the death of the latter's husband until her own death five years before that of decedent. Appellant got along well with his aunt whom he visited three to four times a year. It was not until after her funeral that respondent told him that decedent had made a will and torn up the old one. In 1938 decedent told him of a will she had made. About that time she set up a joint tenancy with him in a safe deposit box, giving him a key which he still possessed. She never requested its return. The 1927 will was still in the box at the time of her death. Neither he nor any member of his family had ever quarreled with decedent.

The night before she went to the hospital decedent told Mrs. Van Gieson that respondent had treated her badly

when she was at respondent's home. Decedent nearly froze because they threw all the windows open. Decedent had made respondent bring her home.

Barbara Crowley had been friendly with decedent and respondent for a long time. On Wednesday or Thursday before decedent died, respondent told Mrs. Crowley that decedent had made a will in which appellant was excluded, saying "I fixed that"; that decedent had left a little to sisters, to Bobbie (appellant's son) and to respondent. Respondent had gotten a lawyer for the will and a doctor and nurse had signed it. The witness had seen decedent at respondent's home about a week before she went to the hospital and the house was cold. The heater was not operated until the witness complained.

Katherine Leap lived across the street from decedent and knew her for about six years. While decedent was at respondent's home decedent told the witness on the phone that she was frozen; that all the windows were kept open, that she wanted to go home but they would not let her, and that she was taken there by respondent and her son grabbing each arm and taking her to the automobile.

Attorney Mueller prepared the 1927 will. The attorney-client relationship between him and decedent commenced in 1926 and continued. From time to time he had performed services for her and gave her advice. There never had been any misunderstanding between them nor any disagreement. Respondent testified that decedent did not want Mueller because he had previously attached her safe deposit box in order to collect a bill and that he had beaten her out of $1,800.

■ A nonsuit may be granted when disregarding all conflicting evidence and giving contestant's evidence all the value to which it is legally entitled indulging every legitimate inference that may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to obtain a verdict in favor of contestant. (*Estate of Teed*, 112 Cal.App.2d 638 [247 P.2d 54]; *Estate of Bemmerly*, 110 Cal.App. 550 [294 P. 33].)

■ "Substantial" evidence means more than a mere "scintilla" of evidence. ■ The usual indications of undue influence are (1) unnatural provisions in the will, (2) the dispositions of the will being at variance with the expressed intentions of the testatrix, (3) an opportunity of the beneficiary to control the testamentary act, (4) decedent's condition to be such as to permit of a subversion of her freedom

of will, (5) confidential relationship between beneficiary and testatrix, and (6) beneficiary active in procuring the execution of the will. (See *Estate of Lingenfelter, supra,* 38 Cal.2d 571.)

(1) Here the provisions of the will were not unnatural. Comparing it with the will of April 28, 1927, upon which appellant relies, there is no such difference as would be expected in a will obtained by undue influence. The early will made respondent's husband the executor, with appellant alternate executor. The later will makes respondent executrix. The earlier will gave appellant's mother 5/15ths of the estate and the other 2/3rds to decedent's sisters in shares of 2/15th each, and nothing to respondent. At the time of the later will the sisters were all dead. It gives appellant $100, 1/7th of the estate to appellant's son, Robert; 1/7th to the children of each of the deceased sisters, and 1/7th to respondent. Thus it increases slightly the interests of the descendants of the sisters, over that given their mothers in the first will, except as to appellant's mother's descendants. As to them there is a reduction from 5/15ths to 1/7th plus $100. It places appellant's branch of the family upon the same footing as that of the other branches. ▇▇▇ There is nothing unnatural or unusual in a testator giving an old friend a share in the estate, nor in reducing an amount left to a nephew. ▇▇▇ A nephew is not a natural object of a person's bounty. (*Estate of Nolan,* 25 Cal.App.2d 738, 742 [78 P.2d 456]; *Estate* of *Martin,* 170 Cal. 657 [151 P. 138].) Respondent was the person a neighbor called in when decedent was sick and was the one who accompanied decedent to the hospital. At the hospital she made a $100 deposit in order to obtain entry for decedent. From the record she apparently was the only one interested in the old lady's welfare. The will shows that in spite of her old age and illness testatrix had a clear conception of who her relatives were. It is unusual to find a situation in which one who it is claimed has the power to unduly influence a testator, is content with receiving a modest 1/7th interest for herself. (2) We have no expressed intentions of the testator with which the will is at variance, other than the difference in wills made 26 years apart. (3) While the evidence upon the subject is not strong, there is evidence of an opportunity by respondent to control the testamentary act. Respondent procured the lawyer for decedent; she claimed that decedent declined to use the lawyer who had represented her for years because of a reason which that lawyer denied

existed. While the testimony of Dr. Haage is unsatisfactory and confused, a jury could have determined therefrom that respondent and her son were in decedent's room at the time of the execution of the will. (4) Likewise it can be inferred that because of decedent's physical weakness she would have been unable to resist a subversion of her freedom of will had such subversion been exerted by respondent.* (6) Other than the testimony of Mrs. Crowley, there is no evidence of the exertion on decedent by respondent of pressure to bring about the testamentary act. There are some suspicious circumstances, such as respondent's false testimony in her deposition that she did not know the lawyer, had not suggested him to decedent, did not know of the will until after the latter's death. But Mrs. Crowley testified that shortly before decedent's death respondent told the witness that decedent had made a will leaving appellant nothing, and stated ''I fixed that.'' We know of no way in which a court in order to grant a nonsuit may completely disregard this testimony. If believed, it puts respondent in the position of having admitted in effect that the will in respect to its treatment of appellant was the will of respondent and not of testatrix. The determination of the credibility of Mrs. Crowley is not a matter for the trial court on nonsuit, nor for this court, but for the jury. ▮ It is with reluctance that we reverse the judgment on this issue, because it must be admitted that the evidence other than the testimony of Mrs. Crowley is exceedingly weak. However, we have no alternative as Mrs. Crowley's testimony, if believed, would support a finding of a jury, if made, that the will was the result of respondent's ''fixing'' rather than the judgment of the decedent.

The judgment is reversed as to the issue of undue influence. In all other respects it is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied June 27, 1957, and the petition of respondent Annie Hospodarsky for a hearing by the Supreme Court was denied July 24, 1957.

---

*(5) There is no evidence of confidential relationship between testatrix and respondent.