[Civ. No. 27085.   Second Dist., Div. Two.   Aug. 9, 1963.]

Estate of FRED L. WRIGHT, Deceased. FREDERICK WILLIAM FINLAY, Plaintiff and Respondent, v. SERENA H. LESTER, as Executrix, etc., Defendant and Appellant.

E. D. Yeomans for Defendant and Appellant.

Wellington Y. Kwan for Plaintiff and Respondent.

FOX, P. J.—Appellant, Serena Lester, was named as executrix of the will of Fred Wright, the decedent, which was dated August 3, 1959. The will was admitted to probate, and appellant duly qualified as executrix following the death of decedent on June 17, 1960. Frederic Finlay, a nephew and

legatee of decedent, filed a contest to a codicil to decedent's will, dated June 9, 1960, on, *inter alia*,[1] the following grounds: (1) that decedent was acting under the undue influence of appellant who "substituted her will in place of" decedent's and "threatened to put him [decedent] in an institution unless he cooperated with her"; and (2) that decedent was not of sound and disposing mind at the time of the execution of the codicil. The court found for the contestant on both of these issues, and entered a decree that the codicil be denied probate.

The basic issues on appeal are: (1) undue influence was not established; (2) there was no evidence to support the finding that decedent was of unsound mind.

The codicil covered the following items: (1) the equity in a 1957 Porsche automobile, apparently owned jointly by decedent and appellant, was bequeathed to appellant, provided she assumed any balance owing on the vehicle; (2) a camera and other photographic equipment were bequeathed to appellant; and (3) all indebtedness of appellant or George F. Lester (appellant's husband) to decedent or his estate, present or future, was cancelled.

Appellant and her husband had known decedent 25 to 30 years. He came to California to live in 1958. Appellant procured a real estate broker to find a suitable home for him. The price of the house that was purchased was $15,500. Title was placed in the names of decedent and appellant as joint tenants. Decedent made the initial and subsequent monthly payments. The property was subject to a first and second trust deed. Early in 1960, he received $13,000 as a final payoff on a note which had theretofore brought him $400 of his monthly income of $505. A portion of the funds from this final payment was used to pay off the second trust deed on decedent's home. Appellant employed a housekeeper for decedent in 1959. Appellant paid decedent's bills, did his shopping, took him to the doctor, and gave him his shots as directed by his doctor, took him to church and generally looked after him. Decedent frequently had dinner at the home of appellant and her family. A joint bank account was opened in the name of decedent and appellant. This was later closed and a trustee account opened with appellant as the trustee. The $13,000 payment mentioned above was deposited in this account. Later, according to appellant, she

---

[1]The court found in favor of appellant on the other grounds of contest. Hence they are not material on this appeal.

and her husband received $8,000 from this account which was to be used in taking care of him, if needed, so that he would not be put in a rest home; anything that was left of this amount was to be theirs. Decedent was suffering from cancer of the bone. He and appellant at one time had a joint account in the Southern Pacific Federal Credit Union where appellant had worked for some years, terminating her employment apparently in 1959. It was while working at the Southern Pacific that appellant became acquainted with Mr. Yeomans, who was attorney for the company. It was upon her recommendation that he was employed by decedent to prepare his will, and the codicil here in question. Mr. Yeomans, however, had never represented appellant. The only testimony about the preparation of the codicil was that decedent prepared in his own handwriting instructions for its preparation which were sent to Mr. Yeomans and from which he prepared the codicil. Appellant was present in the room when the codicil was executed but there is no testimony that she participated in any way in its execution. The witnesses were the brother and sister of appellant but they had known decedent for 18 to 25 years. Their testimony is that they were not there at appellant's request but to visit decedent.

Dr. J. Whitcomb Brougher, Jr., pastor of the church attended by appellant and her family and decedent, had known decedent for more than two years. He had attended church until two months before his death. During the last six months of decedent's lifetime, Dr. Brougher had seen him once a week for the first four months, and two or three times a week during the last two months. During the last ten days Dr. Brougher had visited him every day or two, and the last night before he passed away he spent three or four hours with him. The doctor testified that decedent "seemed to me to feel towards them [appellant and her family] as though they were his own family. . . ."

Early in 1960 appellant and her family moved from La Crescenta to within a few blocks of decedent's home in Glendale in order to be near him.

Contestant Finlay, a nephew of decedent, testified he lived in Farmington, New Mexico; that decedent lived with him for a year prior to his leaving in 1958; that decedent left while he was away on vacation "because of the trouble existing between he and my wife, and he decided to move while I was on my vacation in Southern California and while my

wife and children were in Denver so that there would be no argument or recriminations one way or the other." On this point Dr. Brougher testified that decedent told him he left his nephew's home in New Mexico because "things didn't work out like he had thought, that he didn't feel that he was quite as welcome there as he thought he would be. . . ."

Decedent's feelings toward appellant are shown in his letter to respondent, dated February 4, 1960, approximately four months before he passed away, portions of which are as follows:

"I made a new will about 6 months ago but I may have to make a codicil and change it some. It has been in my mind for months.

"By the time I go there won't be much money left and it will have to read differently.

"Serena [appellant] has been so wonderful to care for me the way she has I am going to see that she is well taken care of. . . .

"Serena has a joint tenancy in the house with me as I could not have gotten the loan to buy it without she came in with me. So she will carry on the payments as long as she wants to then rent or sell it as she pleases. If she sells my equity goes to her. . . .

"She has carted me over to the doctors day after day as necessary. Took care of all my things while in the hospital. Now she comes twice a day to give me shots and is doing all my correspondence and bookkeeping and all that on top of keeping her family going. So I guess you can see my view point. . . .

"On top of all her other work she just sold her house up in La Crescenta and bought a home down here on Opechee Way three blocks from here."

Pertinent principles relative to what is necessary to constitute such undue influence as will invalidate a will or codicil are: "Undue influence consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating on it; some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment." (*Estate of Ricks*, 160 Cal. 467, 480 [117 P. 539].) "It is not undue unless the

pressure has reached a point where the mind of the person subjected to it gives way before it so that the action of such person taken in response to the pressure does not in fact represent his conviction or desire, brought about perhaps by argument and entreaty, but represents in truth but the conviction or desire of another." (*Estate of Anderson*, 185 Cal. 700, 707 [198 P. 407].) ■ In *Estate of Welch*, 43 Cal.2d 173 [272 P.2d 512], the court stated at pp. 175-176: " '[I]t must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator. [Citation.] . . . mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. [Citation.]

■ " 'The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made." [Citation.]' "

Applying these principles to the factual picture at hand, it is quite apparent that undue influence is not established unless the facts are sufficient to raise the presumption of undue influence on the part of appellant.

■ In this connection it should be noted that the court found that a "fiduciary relationship existed between the testator and the beneficiary." This, however, is not sufficient to raise the presumption of undue influence and shift the burden of proof. In *Estate of Bould*, 135 Cal.App.2d 260 [287 P.2d 8, 289 P.2d 15], the court pointed out (p. 274): "The mere existence of a confidential[2] relationship coupled with opportunity to impose the beneficiary's will upon the testatrix is not enough to shift the burden of proof. 'As suggested in *Estate of Higgins*, 156 Cal. 257 [104 P. 6], a "presumption of undue influence" arises from proof of the existence of a confidential relation between the testator and such a beneficiary, "*coupled with activity on the part of the latter in the preparation of the will*." The confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of

---

[2]"Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another." (*Estate of Cover*, 188 Cal. 133, 143 [204 P. 583]; *South* v. *Wishard*, 146 Cal.App.2d 276, 284 [303 P.2d 805]. (Footnote ours.)

the will.' [Citation.]" The court further commented (p. 275) that "the addition of interest and motive to subvert the testatrix' will does not change the burden; activity on the part of the one occupying the confidential role is requisite. That activity must be in the preparation of the will." There is, however, no finding relative to any activity on the part of appellant in the preparation of the codicil. And the evidence would not support a finding that she had any part in its preparation. The only connection she appears to have had in the matter was the transmission of decedent's written instructions to the attorney for the preparation of the codicil.

But it is suggested that appellant was active in procuring the execution of the codicil, that appellant profited unduly at the expense of decedent's nephew (the respondent), and that since there was a fiduciary relation between the appellant and decedent, that was sufficient to shift the burden of proof. Just what part, if any, appellant had in procuring the execution is not disclosed by the findings. The evidence reveals only that she was present at the execution of the codicil. This is not sufficient to raise the presumption of undue influence. In *Bould, supra* (p. 275), the court stated: "Some incidental activity in the execution, rather than the preparation of the will, is not enough to swing the burden." The court further noted that "It has been held that the mere fact of the beneficiary procuring an attorney to prepare the will is not sufficient 'activity' to bring the presumption into play [citations]." On this question of activity on the part of the proponent, the court pointed out in *Estate of Ausseresses*, 178 Cal.App.2d 487 [3 Cal.Rptr. 124], at page 491, that "The necessary active participation cannot be inferred from the fact that the proponent accompanied the testatrix to the attorney's office [citations] or that the proponent selected the attorney [citations], or that the proponent was present at the execution of the will, . . . [citations] or that the proponent was present when instructions were given as to the contents of the will, . . . [Citations.]"

In arguing this aspect of his case, respondent makes a wholly unwarranted and inapplicable assumption, *viz.*, that appellant profited unduly by the codicil, i.e., that its provisions are unnatural. *Estate of Jacobs*, 24 Cal.App. 2d 649 [76 P.2d 128], is in point. In that case, as here, a nephew was seeking to upset a will which made bequests to persons who were not blood relatives but who were de-

cedent's friends. The court stated (p. 651) that "Nephews are not necessarily the natural objects of the bounty of an aunt." (Quoted in *Estate of Arnold,* 16 Cal.2d 573, 588 [107 P.2d 25].) The court went on to point out in *Jacobs* that: "While the beneficiaries were not related by blood to Mrs. Jacobs, they were her friends. They were kind to her and assisted and cared for her at the close of her life." The court then commented (p. 652): "Moreover, it is well settled that collateral heirs, such as brothers and sisters, are not 'natural objects of bounty' as that term is used in the interpretation of wills, and therefore, in cases such as this, where the next of kin are collaterals and one or more are unprovided for in the will, the pretermitted persons, in order to establish that the instrument is unnatural, must show affirmatively that they had peculiar or superior claims to the decedent's bounty; and if no such claim is adduced, the instrument cannot be held to be unnatural. [Citation.]" This too was quoted in *Arnold, supra.* In *Estate of Darilek,* 151 Cal.App.2d 322 [311 P.2d 615], the court stated at page 331: "There is nothing unnatural or unusual in a testator giving an old friend a share in the estate, nor in reducing an amount left to a nephew. A nephew is not a natural object of a person's bounty. (*Estate of Nolan,* 25 Cal.App.2d 738, 742 [78 P.2d 456]; *Estate of Martin,* 170 Cal. 657 [151 P. 138].)" In the case at bench there is a dearth of any showing by contestant that he had "any peculiar or superior claim to decedent's bounty." It therefore cannot be said that appellant profited "unduly" from the codicil to decedent's will—that it was unnatural in its provisions.

In this connection the well-settled rule should be noted that: "It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator." (*Estate of Welch,* 43 Cal.2d 173, 178 [272 P.2d 512], and authorities cited in *Bould, supra,* p. 270.) ▪ Actually, the codicil is in harmony with the letter decedent wrote his nephew some four months before it was executed. He pointed out that he might have to make a codicil and change his will some; that by the time he passed on there would not be much money left and it would have to read differently. He also speaks of how wonderfully appellant has taken care of him and says, "I am going to see that she is well taken care of." The codicil was an obvious effort

to take care of this situation which he says "has been on my mind for months." Under the circumstances and feeling as decedent did toward appellant, this was a natural thing for him to do. (*Estate of Bullock,* 140 Cal.App.2d 944, 950 [295 P.2d 954, 297 P.2d 633].) The judgment cannot be supported on the theory of undue influence.

It is unnecessary to discuss the finding that decedent did not possess testamentary capacity at the time of executing the codicil for actually there is no substantial evidence to support this finding.

Furthermore, the court erred in excluding the testimony of Dr. Brougher as to decedent's mental condition on the day the codicil was executed. Specifically, the question was: "Particularly referring to the date of June 9, 1960, which would be eight days prior to his death, from your observations in seeing him, what, in your opinion, was his mental condition at that time?" Considering the relationship between the witness and decedent, and the frequency with which the witness visited decedent during the last six months of his lifetime—and especially the last two months of that period—it seems clear that the witness was competent to express an opinion as to decedent's mental condition. (*Estate of Lefranc,* 95 Cal.App.2d 885, 889 [214 P.2d 420].)

The judgment is reversed.

Herndon, J., and Smith, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.