[Civ. Nos. 14997, 14998. First Dist., Div. One. Feb. 25, 1952.]

Estate of CLINTON WALTER HAYWOOD, Deceased.
WALLACE T. MASTERS, Respondent, v. HOWARD
E. HAYWOOD, Appellant.

Price, Macdonald & Knox and Allen Grimes for Appellant.

Paul D. Morse for Respondent.

PETERS, P. J.—Clinton W. Haywood died on July 6, 1950. By a will executed on August 7, 1947, he left his entire estate, valued at about $7,000, to Wallace T. Masters, his nephew, and disinherited his son, Howard E. Haywood. Howard filed a petition alleging that his father had died intestate and requesting letters of administration. A few days later Wallace filed a petition to probate the will of August 7, 1947, and also filed opposition to Howard's petition for letters of administration. Howard filed a contest to Wallace's petition, alleging lack of testamentary capacity and undue influence. The court admitted the questioned will to probate, appointed Wallace executor, and denied the

petition of Howard. Howard appeals from the judgment admitting the will to probate and granting letters of administration to Masters, and from the order denying Howard's petition for letters of administration. The two appeals have been consolidated. The basic contention made is that the evidence is insufficient to support the findings.

### The Pertinent Facts

The decedent, aged about 82, died on July 6, 1950, he then being a widower, his wife having died in December of 1946. He left an estate consisting primarily of a house and lot. At the time of his death he had four heirs, one being his son Howard, the appellant, and three nephews, one of whom is Wallace Masters, the respondent.

The decedent, then about 79, executed two wills in 1947, in both of which Masters was named sole beneficiary, and Howard was disinherited. In 1947, Howard was 52 years of age. The evidence shows that prior to 1947 there had been a long period of friction between the decedent and his son. Howard had left home to join the army when he was but 17 years of age, and this was done against the wishes of his father. Upon his return from the war Howard lived with his parents, but there were differences and disagreements with his father. In 1928, Howard married. His father did not approve of this marriage, and did not like Howard's wife—a dislike which became increasingly intense. In 1946, or early 1947, Howard and his wife separated. He was then unemployed because of a strike, and asked his father if he could come and live with him. The father consented, on condition that Howard would pay one half the expenses of the household. At that time decedent was living in his own home, attended by a housekeeper, and his sole income was a $60 a month old age pension.

Wallace Masters, the respondent, and nephew of decedent, testified that he and his wife did not particularly like decedent's wife, so that in 1945 and 1946 he visited decedent only a few times, and the decedent did not visit him at all. But after the death of decedent's wife in December, 1946, and during 1947, the visits of Masters became more frequent and occasionally decedent visited the Masters' home. The relationship became increasingly friendly, and the decedent depended upon Wallace to handle his few business affairs. Thus Wallace, after the death of Mrs. Haywood, filed the necessary papers with a fraternal organization to secure the insurance benefits; he secured for decedent an attorney to

terminate the joint tenancy in the family home; he supervised the securing of a fire insurance policy; he looked out for the taxes; and paid one or two accounts. The decedent clearly had trust and confidence in Wallace and his judgment, and had no such trust and confidence in his son.

The decedent executed two wills, one on May 13, 1947, and the second on August 7, 1947. Both were drafted by attorneys. They are substantially the same in that, in both, Masters is bequeathed the entire estate. In the first will Howard is completely disinherited; in the second he is bequeathed $1.00.

The first will was drafted by Attorney Meinhold. Meinhold was selected by Masters, was his attorney, and drafted the will from instructions given to him by Masters. He never saw or consulted with the testator. Masters testified that he had these services performed at the request of the decedent; that late in March or early in April, 1947, he visited decedent, at his request; that decedent stated that he wanted to draft a will in which he wanted Howard to get nothing. The decedent gave as reasons for wanting to disinherit his son that he felt that Howard would waste anything received on drink, and that Howard was not able to handle financial matters. The decedent at first said nothing about a beneficiary. Masters called this omission to his attention, telling him that he could leave his property to anyone he wanted, and suggested leaving it to a union that decedent had once helped to organize, or to the state, or to charity. The decedent replied that he wanted to leave his property to Masters. Masters told the decedent to think it over, and no decision was then made. A short time later, in early April, 1947, the decedent called Masters and insisted that a will be drawn naming Masters as beneficiary. When Masters asked the decedent about an attorney, the decedent told him to take care of it. Masters then had Meinhold prepare the will, and mailed it to the decedent, together with instructions for its execution. This will must have been received by the decedent towards the end of April, 1947. The decedent kept the will unexecuted for several weeks, and then telephoned to Masters and requested him to supervise its execution. Masters thereupon called on the decedent and the two then visited the Arnetts, neighbors, and asked them to witness it. The Arnetts first read the will aloud to the decedent and he stated that he understood its provisions, and then the Arnetts signed it as witnesses. The decedent then turned the will over to

Masters, together with some other documents, and requested him to keep them in his, Masters', safe.

Howard, who was then living with his father, saw the will on his father's dressing table and read it. It was then unexecuted. Prior to this, he had seen and read the letter of instructions sent by Masters. Howard did not mention the will to his father, but on April 28, 1947, almost immediately after reading the will, filed a petition for letters of guardianship of the person and estate of his father on the ground of incompetency. The decedent filed opposition to this petition in which he denied his incompetency and alleged that Howard was not a fit and proper person to be guardian and that Masters was such a person. Hearings were had on June 19th, and August 6, 1947. At the conclusion of the last hearing the trial judge denied Howard's petition from the bench, stating that he found that the decedent was not incompetent. The trial judge also stated that he did not think the will that had been executed on May 13, 1947, would stand up in the face of a contest. Findings were waived and a formal order denying the petition was entered August 26, 1947.

During the first hearing of this guardianship proceeding held on June 19, 1947, the decedent was asked if he had signed the first will. He replied that he had not. Masters was apparently not in court when this testimony was given, although his wife was then present.

On August 7, 1947, the day after the conclusion of the guardianship proceedings, the second will was executed. This will was drafted by Blaine, then an attorney, now a judge of the municipal court. Blaine testified that the decedent came to his office alone, told him that he wanted a will drafted, and how he wanted to leave his property. The will was then drafted and executed in Blaine's office, Blaine and his secretary acting as witnesses. Blaine did not know the decedent before he came into the office on August 7, 1947, but early that morning, or late the night before, he had received a telephone call from Attorney Morse, decedent's attorney in the guardianship proceeding and Masters' attorney in this proceeding, and that Morse had told him that his client, Clinton Haywood, wanted to draw a will and that he, Morse, felt he should not draft it, and requested Blaine to do so. Blaine agreed. He testified that it was his best recollection that Morse did not mention the name of Masters in this telephone conversation. He also testified that when he drafted the second will he knew nothing about the first will. Blaine could

not remember what the decedent told him about the reason why he was cutting off his son, but had a general impression that the decedent gave him some good reasons.

Masters testified that after the hearing on August 6th, he accompanied the decedent and Attorney Morse and his associate to lunch, and then took the decedent home. Masters knew nothing about the proposed visit to Blaine's office, arranged by Morse, and had nothing to do with those arrangements. He received a copy of the second will about three or four days after it was executed, but did not see the original, which had been kept by Blaine, until after decedent's death.

On the issue of mental competency, Blaine and his secretary testified that, in their opinion, the testator was competent to make the will of August 7, 1947. Masters and his wife testified that the testator knew the nature of his property and who were the natural objects of his bounty. It was their opinion that he was sane on August 7, 1947. Olive Lawrence, the financial secretary of a fraternal order, had known the Haywoods for 20 years. She had seen the testator up to December, 1946, about once a month, but thereafter saw him only twice, once in February, 1947, and sometime in 1950. In her opinion, the testator was "very alert" and mentally competent.

As opposed to this testimony, there is much evidence that would have supported a finding, had it been made, that the testator was mentally incompetent. Dr. Adams so testified. On August 5, 1947, he had given the testator a psychiatric examination, apparently in preparation to testify at the guardianship hearing. His examination convinced him that the testator was then of unsound mind; that he was suffering from general and cerebral arteriosclerosis, was confused, his memory was impaired, and he was suspicious, including a paranoid reaction. He was definitely of the opinion that on August 5, 1947, the testator was not competent to make a will. The doctor admitted, however, that the testator then knew his relatives, knew that he had a son and nephew, and knew that he owned the house where he lived. He told the doctor that he intended to disinherit his son because he was not sure of his son's business judgment, and because he was drinking too much.

Several practical nurses, who had worked for the testator before and after he executed the second will, gave it as their opinions that the testator was not competent. They testified as to some filthy and untidy personal habits of the testator,

as to accusations made by him against neighbors, and others, that were false, as to false accusations made by him against Howard, and as to other peculiarities. All of these witnesses, however, admitted that the testator was never confused as to who his relatives, friends and neighbors were, and that he knew that he owned the house. There is substantial evidence that the accusation made by the testator that his son drank to excess was false.

There is also evidence to the effect that on two occasions the testator made statements indicating that he had delusions. On August 6, 1947, at the conclusion of the guardianship hearing, Howard asked his father why he wanted to disinherit him. His father replied: "I was dreaming about Mattie [his deceased wife], and she told me to give it to Wallace, because you had been cheating me." This was testified to by Howard and by a third person who was present. Dr. Adams testified that on August 5, 1947, during the psychiatric examination, the testator told him that at some undisclosed time in the past, while he was walking on a road, a headless animal resembling a wolf appeared and then suddenly disappeared. This hallucination was not related to the will in any way.

The evidence is clear that for many years the testator did not like his son, and frequently expressed this disapproval to many persons.

### The Findings

On this evidence the trial court found, so far as the points raised on this appeal are concerned, that on August 7, 1947, the decedent was of sound mind, was not acting under any fraud, duress, menace, or undue influence of Wallace Masters or any other person, and was fully competent to dispose of his estate by will; that Blaine was not the attorney for Masters, and did not know or meet him until after the death of decedent.

### The Finding of Mental Competency is Supported by the Evidence

The finding that the decedent had sufficient competency to make the will of August 7, 1947, is amply supported. The record shows a judicial finding of competency as of August 6, 1947, in the guardianship proceeding. This was the day before the will was executed. That was a finding that a guardian should not be appointed and that the testator, as of that date, was competent to handle his own affairs. ■ A

guardian might be appointed of a person fully competent to make a will, so that a finding that the testator was competent to handle his own affairs is certainly equivalent to a finding that he was then competent to make a will. In addition, although the evidence is highly conflicting on the issue, there is ample, substantial and credible evidence that the testator understood what he was doing when he executed the will, knew the nature and extent of his property, and knew who his relatives were, and his relationship to them. That is all that is required. In *Estate of Smith,* 200 Cal. 152, 158 [252 P. 325], the proper rule is stated as follows: "A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument. [Citing cases.]" The converse, namely, what is required to show that the testator was of unsound mind, was set forth in *Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45]: "Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done. In short, the abnormality of mind must have had a direct influence upon the testamentary act. [Citing cases.]"

Appellant, in his reply brief, concedes that on the issue of general competency the evidence is conflicting, and that the finding of competency in this sense is supported. It should be pointed out here that even the witnesses who testi-

fied that the decedent was incompetent admitted that he knew the extent and nature of his property and the objects of his bounty. Appellant's main argument on this point is that the will was the result of insane delusions. In this connection he emphasizes the testimony of Dr. Adams and the housekeepers, the testimony relating to the two hallucinations, and the evidence that shows that the testator labored under the apparently mistaken belief that his son was a drunkard.

The evidence relating to the "headless" wolf delusion was in no way related to the making of the will. The hallucination that his deceased wife had directed that the son be excluded, and the evidence that the decedent believed, probably mistakenly, that his son was a drunkard, might support a finding in favor of appellant had such a finding been made, but it does not compel such a finding. Here there is ample evidence of other factors that motivated the testator in making the will. The evidence shows a long period of ill feeling between the father and his son, based not only on the probably mistaken belief that his son was a drunkard, but upon other factors as well. The misunderstandings between the two started when the son left home without consent, followed by a disapproved marriage. In addition, the father felt that his son was unable to manage his own affairs. The disinheriting of the son, in the instant case, is not unexplained. This serves to distinguish the cases cited by appellant. One of the main cases relied upon is *Estate of Sandman*, 121 Cal.App. 9 [8 P.2d 499]. The facts of that case are somewhat similar to those here involved, except that in that case, unlike the instant one, the relationship between the decedent and his disinherited daughter had been harmonious. There, the *trial court* found that the testator was of unsound mind. This was *affirmed* by the appellate court. ██ ██ In so affirming, the appellate court stated the rule to be (p. 13): "As was said in *Estate of Snowball*, 157 Cal. 301 [107 P. 598], '. . . in will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the jury and the trial court; and if there be any substantial evidence to support the finding or verdict it cannot be set aside by the reviewing court, although such court might believe the great preponderance of the evidence was the other way.' " That rule is equally applicable to the instant case. The evidence and the reasonable inferences therefrom are conflict-

ing on the issue, and for that reason the determination of the trial court is conclusive.

### The Finding of No Undue Influence Is Supported

To constitute undue influence the evidence must show that the person charged exercised such control over the decedent that the latter's mind and will were subjugated to the will of the person unduly benefiting from the provisions of the will. (*Estate of Smith,* 200 Cal. 152 [252 P. 325].)

In *Estate of Llewellyn,* 83 Cal.App.2d 534, 562 [189 P.2d 822, 191 P.2d 419], the factors tending to show undue influence are summarized as follows: "Before there is imposed upon the proponent of a will the obligation of presenting evidence of volition, and before the question as to undue influence becomes one of fact for the determination by a jury, there must be evidence, the probative force of which establishes (1) the relations between the one charged with exercising the undue influence and the decedent affording the former an opportunity to control the testamentary act; (2) that the decedent's condition was such as to permit of a subversion of his freedom of will; (3) that there was activity on the part of the person charged with exercising undue influence; and (4) that such person unduly profited as beneficiary under the will. [Citing cases.] It is also the law that evidence must be produced that pressure was brought to bear directly upon the testamentary act. [Citing a case.]" None of these factors alone will create a presumption of invalidity, but in combination they make the question one of fact. (*Estate of Graves,* 202 Cal. 258 [259 P. 935].)

In the instant case the evidence does not compel a conclusion that these factors were present. The evidence supports the implied finding that Masters was not active in the securing of the second will. If we were considering the first will of May 13, 1947, a very strong showing of activity on the part of Masters could be made. That will was drafted by the attorney for Masters, at Masters' dictation, and without the attorney ever seeing or consulting with the testator. In that respect, the case is factually similar to *Estate of Chesney,* 102 Cal.App.2d 708 [228 P.2d 46], where the trial court found undue influence based upon similar facts. But the will here under consideration is the will of August 7, 1947. That will was drafted by Attorney Blaine at the request of the decedent. The decedent was alone with Blaine when the will was drafted, and discussed with Blaine the provisions

of the will. Blaine did not know of the existence of the first will, and did not know Masters. The record shows that Masters did not know that the decedent was going to draft a second will, or that decedent intended to ask Blaine to draft it. Appellant points out that Blaine was recommended to the decedent by Morse, who was Masters' attorney, and that Morse telephoned to Blaine to ask him to draft the will for decedent. Morse had been secured by Masters for the decedent to terminate the joint tenancy after the death of the wife of decedent, and had represented decedent in the guardianship proceeding. He represents Masters in the instant case. But the record shows that Morse was very careful not to suggest to Blaine what the will was to contain, and told him none of the background. The record amply supports the finding that Blaine was not the attorney for Masters, and that decedent had independent legal advice in drafting the will.

Nor are the provisions of the will unnatural under the facts. The evidence shows a long-standing feeling of antagonism on the part of the father toward his son, and a long-standing feeling of friendship toward Masters. It is not at all surprising that after appellant unsuccessfully sought to secure control of his father's property, by having himself appointed guardian, and after seeking to have his father declared incompetent, the decedent would feel some resentment and would continue in his desire to disinherit his son. While it is true that a nephew may not be, from the relationship alone, a natural object of the bounty of an uncle where there are children (*Estate of Chesney,* 102 Cal.App.2d 708, 711 [228 P.2d 46]; *Estate of Nolan,* 25 Cal.App.2d 738, 742 [78 P.2d 456]), here the relationship does not stand alone. The evidence shows that Masters was very friendly with the old man and performed many services for him, services which the father would not permit his son to perform.

While the evidence would have supported a finding, had it been made, that the decedent's mental and physical condition was such as to permit the subversion of his will, it does not compel the concluson that his will was in fact subverted. The evidence shows a stubborn, strong-willed old man who had been unfriendly with his son for many years. It also shows that for many months the decedent continuously intended and had a fixed desire to disinherit his son.

There was no finding as to whether a confidential relationship in fact existed between Masters and decedent. Un-

doubtedly the evidence would have supported such a finding had it been made. (*Estate of Johnson,* 31 Cal.App.2d 251 [87 P.2d 900]; *Estate of Chesney,* 102 Cal.App.2d 708 [228 P.2d 46]; *Estate of Payne,* 94 Cal.App.2d 504 [210 P.2d 916].) But even if such a relationship existed, and therefore a presumption of undue influence arose, the record shows that respondent offered ample evidence to repel the presumption. The finding of no undue influence is amply supported.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.