Filed 9/24/15  Estate of Barrow CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Estate of BERNARDINE BARROW, Deceased. | B253958 (Los Angeles County Super. Ct. No. BP121262, BP118944) |
| KAREN L.G. O'NEILL et al., <br><br> Petitioners and Appellants, <br><br> v. <br><br> RICHARD SORRENTINO, <br><br> Objector and Respondent. | |
| RICHARD SORRENTINO, <br><br> Petitioner and Respondent, <br><br> v. <br><br> KAREN L.G. O'NEILL et al., <br><br> Objectors and Appellants. | B253958 (Los Angeles County Super. Ct. No. BP121262, BP118944) |

APPEAL from an order of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Balisok & Associates, Russell S. Balisok; Beltran, Beltran, Smith, Oppel & Mackenzie and Thomas E. Beltran for Petitioners, Claimants and Appellants Karen L.G. O'Neill and Allan B. DeMille.

Loeb & Loeb, David C. Nelson, Gabrielle A. Vidal and Amy L. Koch for Claimant, Petitioner and Respondent Richard Sorrentino.

_____

This case concerns the deceased Ms. Bernardine Barrow (Barrow) and specifically who will receive the bulk of her estate: a house worth millions of dollars as well as substantial stock holdings.  The possible contenders are:  (1) Richard Sorrentino (Sorrentino), who was initially hired by Barrow for some construction work for the house and then over 13 years became her closest and most trusted friend and caretaker, (2) Karen O'Neill (O'Neill), who Barrow met while vacationing and talked with on the phone frequently but drifted from after 30 years, or (3) Allan DeMille (DeMille), a distant relative with whom Barrow had not spoken in many decades and about whom Barrow frequently complained.  The trial court found for Sorrentino, specifically that Barrow's December 6, 2007 declaration of trust (2007 Trust), July 16, 2008 restated amendment to Bernardine Barrow revocable trust dated December 6, 2007 (2008 Restatement), and July 16, 2008 last will and testament (2008 Will), are all valid and not the product of undue influence by Sorrentino.  O'Neill and DeMille appeal.  We affirm.

## BACKGROUND

### I.      Facts of the case

At her death in 2008, Barrow was a widow and had no surviving parents.  She had no close friends.  She had distant relatives but did not like or want anything to do with them.  She had no interaction with her family and felt they had taken advantage of her.  For example, DeMille is a first cousin, once removed, and had no contact with Barrow for many decades before she died.  DeMille was one of many relatives about whom Barrow

complained. The chronology below discusses how Barrow met O'Neill and Sorrentino as well as key facts concerning Barrow's health and estate planning efforts.

In 1978, Barrow (then age 62) and her husband met O'Neill (age 22) and her husband while vacationing in Yosemite. O'Neill and her husband worked at the hotel where the Barrows lodged. The four socialized together during the O'Neill's off hours. Over the years, Barrow sent gifts to O'Neill and her family.

In 1995, Barrow (age 77) hired Sorrentino to complete some construction work on her house. After completion of that project, he continued to work on other construction projects as requested by Barrow and assumed increasing responsibilities for daily personal tasks such as retrieving packages and carrying in groceries. Eventually, he became a salaried employee for house maintenance as well as a personal assistant and thus was responsible for managing and hiring other employees in the house (such as the housekeeper, gardener, and caregivers), obtaining personal items such as medicine, dry cleaning, and groceries, and driving Barrow to appointments. For the next 13 years until her death, Sorrentino was in Barrow's life on a near daily basis. Sorrentino took good care of Barrow; he was not only her employee but also her friend.

In 1996, Dr. Terry Jerge (a board certified internist with a large portion of his practice treating the elderly) began treating Barrow. He found her proactive in her medical care and in good health.

Sometime in 1996 or 1998, Barrow was involved in a car accident. The accident did not injure Barrow in any way.

In 1997, Barrow provided in her will that her home and substantial Chevron stock holdings (the bulk of her estate) would pass to Mr. and Mrs. Linn T. Hodge III, her insurance agent and friend, but if they were both deceased then to O'Neill. The remaining items (e.g., a car, $25,000, personal property) were left to O'Neill. Barrow did not leave anything to DeMille.

In 1998, Barrow nominated Sorrentino as her attorney-in-fact for health care decisions. She also nominated him as her conservator.

In 1999, Barrow executed a will providing the bulk of her estate to Sorrentino. Barrow did not provide in her will that O'Neill would receive any substantial gifts. Barrow did not leave anything to DeMille. Consistent with that will, sometime between 1997 and 2000, Barrow told O'Neill that Sorrentino was going to receive the bulk of her estate. All wills after this date continued to leave the bulk of Barrow's estate to Sorrentino.

In 2001, Barrow broke her wrist and thereafter had trouble writing. Thus, she began having some physical limitations.

In 2002, Barrow again executed a will that gave the bulk of her estate to Sorrentino. Barrow did not leave anything to DeMille.

In 2004, O'Neill visited Barrow for an afternoon. O'Neill and Barrow never lived in the same city, and, while O'Neill visited Barrow at least four times, Barrow never visited O'Neill in return. O'Neill and Barrow did speak on the phone about every two weeks until Barrow's death.

In 2005, Barrow started complaining to Dr. Jerge about some memory problems. In June, Dr. Jerge opined that Barrow was suffering from "some level of dementia" but that this mild dementia would not have been so serious as to impede Barrow's ability to make intelligent decisions. In July, Barrow suffered from hallucinations over a weekend and spoke to Dr. Jerge about them. She knew that the hallucinations were not real; Dr. Jerge concluded that Barrow was "fine" and "rationale." He prescribed Barrow with Aricept. Also in 2005, O'Neill visited Barrow for a few hours (visit No. 2). Also around 2005, Barrow began making a number of substantial gifts to Sorrentino, including a tractor, a car, architectural plans, and paying his credit card bills, which may have been work-related expenses.

The wills and trusts at issue in this case were executed in 2007 and 2008. Barrow was 89 years old in 2007. Barrow executed at least 10 trusts and wills: the first six

drafted by attorney Lambert Michael Javelera (Javelera) from 1997 to 2006,[1] and the last four drafted by attorney Christopher Botti (Botti) from 2007 to 2008.[2] The new attorney took over because Javelera had health issues that made him unavailable. Sorrentino referred Barrow to Botti.

In December 2007, Barrow again left the bulk of her estate to Sorrentino, specifically, in the 2007 Trust and a 2007 will, prepared by Botti. Barrow did not leave anything to DeMille. Botti's law partner, Paul Morrison, contacted an old college friend, attorney Seth Friedman, to interview Barrow and prepare a certificate of independent review (CIR). Friedman met with Barrow two months after she executed the 2007 Trust. Only Friedman and Barrow were in the room when they discussed the 2007 Trust. The counseling session lasted 60 to 90 minutes. After meeting with Barrow, Friedman drafted and executed the CIR. He billed Barrow $750 for his services.

In 2008, Barrow executed the 2008 Restatement and 2008 Will, again leaving the bulk of her estate to Sorrentino. Barrow did not leave anything to DeMille. Also in 2008, O'Neill visited Barrow (visit No. 4). Unlike the other three visits, this one lasted two nights. Sorrentino suggested some alone time for the two women, but Barrow emphatically said no. Toward the end of 2008, Barrow was cognitively impaired. On December 23, Barrow passed away at age 90.

## II.     Procedural history

Several petitions were filed before the trial court. O'Neill and Sorrentino each filed separate petitions to admit to probate Barrow's 1997 Will and 2008 Will, respectively, in case No. BP118944. O'Neill and Sorrentino then each filed separate petitions to determine the validity of the 2007 Trust, in case No. BP121262. The trial court related the two cases and heard them together.

---

[1] June 11, 1997 will (1997 Will), April 19, 1998 will, January 17, 1999 codicil, February 7, 1999 will, January 5, 2002 will, and April 6, 2006 codicil.

[2] 2007 Trust, December 6, 2007 will (2007 Will), 2008 trust, and 2008 Will.

The trial court held a bench trial and heard testimony from several witnesses, including Sorrentino, Dr. Jerge, Botti, Friedman, Javelera's son (Javelera passed away in 2009), Mr. Hodge, and O'Neill.

In an organized and comprehensive opinion, the trial court explained its findings. Probate Code former section 21350[3] presumptively prohibits donative transfers from a dependent adult to her care custodian, such as the 2007 Trust and 2008 Restatement. But, the trial court found two exceptions in former section 21351 apply to remove that presumption: subdivision (b), because Friedman provided a valid CIR, and subdivision (d), because it found clear and convincing evidence that the donative transfers were not the product of undue influence. The trial court also decided that even though it already found the statutory exception applies, it would proceed to determine whether there was undue influence under common law; on that issue, the trial court concluded O'Neill and DeMille had failed to meet their burden of proof. The trial court also found that Sorrentino was not the transcriber of the 2007 and 2008 wills and trusts.

O'Neill and DeMille then filed a request for a statement of decision. Sorrentino responded. The trial court issued a statement of decision, adopted Sorrentino's response as the court's response to O'Neill and DeMille's objections, and deemed its tentative ruling to be the statement of decision.

## DISCUSSION

I. **Substantial evidence supports the trial court's finding that there is clear and convincing evidence of no undue influence.**

### A. *Standard of review*

If, on the entire record, there is substantial evidence to support the finding of the probate court, we uphold those findings. (*Estate of Odian* (2006) 145 Cal.App.4th 152, 167.) We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or evaluate the weight of the evidence. (*Id.* at p. 168.) Rather, we draw all

---

[3] All further statutory references are to the Probate Code unless otherwise indicated.

6

reasonable inferences in support of the findings, view the record most favorably to the probate court's order, and affirm even if other evidence supports a contrary conclusion. (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.)  Appellants have the burden of showing there is *no* substantial evidence supporting the probate court's order.

### B.    Applicable Probate Code sections

Former sections 21350 and 21351 provide the legal framework for this case. Former section 21350 presumptively prohibits a dependent adult (such as Barrow in 2007 and 2008) from making a donative transfer (such as the 2007 and 2008 wills and trusts at issue) to her care custodian (such as Sorrentino).  But there are several exceptions, recited in former section 21351.  Under subdivision (b), the transferor can obtain a CIR.  Under subdivision (d), a court can determine upon clear and convincing evidence that the transfer was not the product of undue influence.

### C.    Substantial evidence supports the trial court's finding no undue influence

Here, the record shows substantial evidence to support the trial court's finding of no undue influence.  In a well-reasoned opinion, the trial court explained that it relied on testimony from Dr. Jerge, Mr. Hodge, Friedman, Barrow's long-time housekeeper, Javelera's son, Sorrentino, and even O'Neill, plus stipulated facts from the parties and documentary evidence.

First, there is substantial testimony from essentially all the key witnesses (Dr. Jerge, Friedman, Mr. Hodge, and Sorrentino) that Sorrentino provided excellent care to Barrow, that Barrow and Sorrentino were close friends, and that Sorrentino was in Barrow's life on a near daily basis for the last 13 years of Barrow's life.  That testimony is confirmed in documents such as Ms. Hodge's note to Sorrentino after Barrow died, which recites that Sorrentino provided "wonderful care" for Barrow.  Other supporting documentary evidence includes legal documents in which Barrow nominated Sorrentino as her conservator and her attorney-in-fact for health care decisions in 1998, long before Barrow had cognitive issues.

7

In addition, there is substantial testimony from witnesses (Friedman, Javelera, Barrow's long-time housekeeper, and even O'Neill) that Barrow repeatedly expressed her intent to gift the bulk of her estate to Sorrentino. That testimony is confirmed in documents such as Barrow's 1999 and 2002 wills executing that intent.

Further, the only medical evidence before the trial court was Dr. Jerge's testimony. He opined that Barrow had no memory problems until 2005 and, even then, the mild dementia would not impede her ability to make intelligent decisions. Dr. Jerge opined that it was not until three months before her death that Barrow's decisionmaking ability was impaired. That testimony is confirmed in documents, specifically his contemporaneous notes describing Barrow's mental and physical health. Even testimony from O'Neill confirmed that there was no decline in Barrow's mental acuity until 2005. The trial court noted that even by that point, Barrow had already executed wills providing the bulk of her estate to Sorrentino (in 1999 and 2002).

Second, in contrast to Sorrentino, DeMille was not involved in Barrow's life. The parties stipulated that DeMille had no contact with Barrow for many decades. Even O'Neill testified that DeMille was one of many relatives about whom Barrow complained. Generally, several witnesses (Mr. Hodge, Sorrentino, and O'Neill) testified that Barrow did not like and had no interaction with her family.

Third, while O'Neill may have had a closer relationship to Barrow than DeMille, she was not as close to Barrow as Sorrentino. The trial court relied on O'Neill's own testimony that she only visited four times in four years, the visits did not last long, and during the last visit Barrow refused to spend alone time with O'Neill.

### D. The testimony of trial witness Friedman, who the trial court found credible, can be substantial evidence supporting the trial court's decision.

O'Neill and DeMille argue at length that the trial court erred in relying on Friedman's testimony *for any purpose*. But, O'Neill and DeMille are essentially asking this court to reassess Friedman's credibility. That is not our role. A party's "lengthy arguments as to the credibility and effect of the testimonies" of witnesses "are not

8

appropriately addressed to this court"; "[t]he trier of fact was the exclusive judge of those matters." (*Brewer v. Simpson* (1960) 53 Cal.2d 567, 587.) "[T]he testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence, and we must defer to the trial court's determination that these witnesses were credible." (*Estate of Odian*, *supra*, 145 Cal.App.4th at p. 168.) Here, the trial court was entitled to credit entirely Friedman's testimony and discredit entirely any witness testimony proffered by O'Neill and DeMille. This problem—seeking an appellate court to perform the role of a trial court—runs throughout appellants' briefs and is the crux (and downfall) of its appeal.

> ### E. Trial court can consider Barrow's 1997 and 1999 wills giving the bulk of her estate to Sorrentino and Barrow's statements that she intended the same

O'Neill and DeMille argue that the trial court erred in considering certain evidence of Barrow's actions (which the trial court found as showing Barrow intended to give the bulk of her estate to Sorrentino) because those actions, according to O'Neill and DeMille, were also the product of undue influence by Sorrentino. Specifically, (a) Barrow's 1997 and 1999 wills (in which, like the 2007 and 2008 wills and trust at issue, Barrow also gave the bulk of her estate to Sorrentino) and (b) Barrow's statements that she intended to give the bulk of her estate to Sorrentino.

#### 1. 1997 and 1999 wills

O'Neill and DeMille's arguments are contradictory to Sorrentino's argument as to how the trial court should consider this evidence. Specifically, though all parties agree the former section 21350 presumption against a donative transfer from a "dependent adult" to her care custodian would apply to the 2007 and 2008 wills, they disagree as to the 1997 and 1999 wills. O'Neill and DeMille argue Barrow was a "dependent adult" due to her age of 77 and because she gave substantial gifts to Sorrentino. Sorrentino argues Barrow was not a "dependent adult" because Barrow did not have any physical limitations until she broke her wrist in 2001 nor cognitive decline until 2005.

The issue is not one of admissibility, as O'Neill and DeMille stipulated the documents could enter into evidence before the trial court, and they made no objection during trial. Instead, the issue is one of weight, and the trial court has complete discretion to credit (or discredit) this evidence. (See *Estate of Odian*, *supra*, 145 Cal.App.4th at p. 167.) The trial court found Sorrentino's argument more persuasive. Substantial evidence supports that finding, such as Dr. Jerge's medical testimony and notes, which the trial court pointed to.

### 2. Barrow's statements

O'Neill and DeMille argue the trial court should not have found credible the testimony from Sorrentino, Friedman, and even O'Neill, that Barrow told each of them she planned on giving the bulk of her estate to Sorrentino. Assessing the credibility of witness testimony is the role of the trial court. (See *Estate of Odian*, *supra*, 145 Cal.App.4th at p. 168.) Thus, the trial court was entitled to credit their testimony.

Further, O'Neill and DeMille argue that former section 21351, subdivision (d) precludes the trial court from considering Sorrentino's testimony *at all*. They misread the code provision, which only precludes the trial court from "solely" relying on the testimony of Sorrentino. Here, the trial court also relied on the testimony of Friedman, O'Neill, and Barrow's long-time housekeeper. The trial court expressly recognized that it was not solely relying on Sorrentino's testimony, in light of the Probate Code prohibition.

### F. Trial court can consider Barrow's substantial gifts to Sorrentino as consistent with Barrow's later gift of the bulk of her estate to him.

O'Neill and DeMille argue the trial court failed to consider Barrow's substantial gifts to Sorrentino as evidence of undue influence. But, the trial court did, in fact, consider this evidence. Specifically, the trial court concluded these gifts did not show undue influence because were Barrow to gift the bulk of her estate to Sorrentino then only Sorrentino would ultimately be affected as Barrow spent down her estate with substantial gifts to him. While O'Neill and DeMille argue the trial court should have come to a

different conclusion, as an appellate court, we do not reweigh the evidence.  (See *Estate of Odian*, *supra*, 145 Cal.App.4th at p. 168.)

> ### G. Trial court can consider Sorrentino the natural object of Barrow's bounty.

O'Neill and DeMille argue that Sorrentino cannot be the natural object of Barrow's bounty for two reasons:  (i) Sorrentino had undue influence on Barrow and (ii) only a descendent, surviving spouse, or parent can be the natural object of one's bounty. O'Neill and DeMille's first argument assumes the conclusion and therefore is rejected. As to their second argument, they cite *Estate of Nolan* (1938) 25 Cal.App.2d 738, but that case contains no bright-line rule that nonrelatives can never become the natural object of one's bounty.  Instead, *Nolan* only concerned relatives:  a beneficiary who was a cousin and contestants who were nephews and nieces. (*Id.* at p. 740.)  *Nolan* merely explained that descendents, spouse, and parents, are assumed to be such "natural objects," merely by the close relationship, but that collateral heirs such as siblings and nephews or nieces, at least based on such relationship alone, are not so assumed. (*Id.* at p. 742.)  Thus, we also reject O'Neill and DeMille's second argument.

> ### H. Trial court's finding under the common law is also affirmed.

Because we decide there is sufficient evidence to support the trial court's finding of clear and convincing evidence of no undue influence, we do not reach O'Neill and DeMille's alternative arguments as to whether there was sufficient evidence of no undue influence under the common law.  The statute supplements the common law. (*Bernard v. Foley* (2006) 39 Cal.4th 794, 800.)  Thus, clear and convincing evidence of no undue influence satisfies both former section 21351, subdivision (d) and the common law.

## II. O'Neill and DeMille's other arguments are moot

An appeal is moot when it is """"impossible for this court, if it should decide the case in favor of plaintiff, to grant any effectual relief whatever."""" (*City of Los Angeles v. County of Los Angeles* (1983) 147 Cal.App.3d 952, 958.)

**A.    O'Neill and DeMille's argument on former section 21351, subdivision (b)**

Because we agree with the trial court that the exception in subdivision (d) applies, we need not decide whether another exception (subdivision (b)) also applies. As the opening paragraph to former section 21351 recites, the presumption against donative transfer "does not apply if *any* of the following conditions are met." (Italics added.)

**B.    O'Neill and DeMille's argument on former section 21350, subdivision (a)(4)**

The trial court already held that the presumption against a donative transfer in former section 21350 applies, pursuant to subdivision (6), where the transferor is a dependent adult and the recipient is the care custodian of that dependent adult. O'Neill and DeMille argue that subdivision (4), where the recipient transcribes the trust or will, also applies. Were this court to determine whether subdivision (4) also applies, however, there would be no effectual relief for O'Neill and DeMille, as they have what they seek: the presumption has been applied. Further, as discussed above, we affirm the trial court's finding that an exception applies to remove that presumption.

**C.    O'Neill and DeMille's argument on California Rules of Court, rule 3.1590.**

O'Neill and DeMille argue the trial court failed to provide a tentative decision pursuant to California Rules of Court, rule 3.1590, and therefore they did not have the opportunity to make objections and request a statement of decision to address the principal controverted issues. Here, the trial court did issue a proposed statement of decision, and then O'Neill and DeMille made objections and requested a statement of decision, to which the trial court responded. Thus, again, O'Neill and DeMille already have what they seek.

**DISPOSITION**

The order is affirmed.  Costs are awarded to Richard Sorrentino.

NOT TO BE PUBLISHED.

                                        JOHNSON, J.


We concur:


        ROTHSCHILD, P. J.


        CHANEY, J.